UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PAULA REED WILSON, *individually and on behalf of the Estate of Orrin Patrick Thomas* | CIVIL ACTION |
| VERSUS | NO. 24-714 |
| KENDALL BULLEN, *Chief, in his official capacity*, ET AL. | SECTION "N" |

**ORDER AND REASONS**

Before the Court is the Defendants' motion for summary judgment.[1] Plaintiff Paula Reed Wilson, suing individually and on behalf of the Estate of Orrin Patrick Thomas, opposed.[2] Defendants filed a reply in support of their motion.[3] Having carefully considered the parties' memoranda, the record, and applicable law, the Court grants the motion in part.

## I. Background

This case arises from the arrest, incarceration, and death of Orrin Patrick Thomas while in the custody of the City of Bogalusa's jail. Thomas's estate brings this action on his behalf against the City of Bogalusa and members of the Bogalusa Police Department: Chief of Police Kendall Bullen, in his official capacity, Captain Janice Johnson, individually, and Officer Lisa Erwin, individually, as well as unnamed John Doe defendants.[4] The following background summary includes uncontested facts except as otherwise noted:

[1] Rec. Doc. 27.
[2] Rec. Doc. 29.
[3] Rec. Doc. 30.
[4] Rec. Doc. 1.

On March 23, 2023, officers of the Bogalusa Police Department arrested Thomas for suspected methamphetamine possession, resisting an officer, and criminal mischief at a local convenience store.[5] They transported him to the Bogalusa Jail/Detention Center where he was detained.[6] An officer's field test of the substance found in Thomas's pocket at the time of his arrest tested positive for methamphetamines.[7] When Thomas arrived at the jail, two employees were working the day shift: Officer Champagne and her partner Zach Miller.[8] Champagne stated that no intake form was completed for Thomas and she made no assessment of him, though it was clear to her that he was under the influence.[9] Thomas was detained in the padded room that the jail uses to house detainees who are intoxicated until they are able to go through the booking process.[10] This cell is under continuous video monitoring on a 55-inch screen that the jail officials "constantly look up at" as they are able.[11]

Champagne and her partner made the decision not to complete the Bogalusa Police Jail Booking Medical Sheet, which asks, among other things, whether a detainee is unconscious or has any visible signs requiring medical attention, because Thomas "wasn't in his right mind" to give clear information.[12] The jail had a medical

[5] Rec. Doc. 27-4 (Arrest Report, Ex. B).
[6] *Id.*
[7] *Id.*; Rec. Doc. 27-3 at 42:3-11, 43:1-2 (Mullen Dep. Tr., Ex. A).
[8] Rec. Doc. 27-12 at 22:19-22 (Champagne Dep. Tr., Ex. N).
[9] *Id.* at 14:9-10, 15:8-21.
[10] *Id.* at 18:10-13, 19:1-10:15, 20:6-15; Rec. Doc. 27-10 ¶ 5 (Warden Charles McDaniel Decl., Ex. J).
[11] Rec. Doc. 27-10 ¶ 5 (Ex. J); Rec. Doc. 27-12 at 20:16-21:18 (Ex. N); Rec. Doc. 27-9 at 30:10-15 (Erwin Dep. Tr., Ex. I) (jail officials are "always looking at [the monitor]"); *see* Exs. O, P, Q, and R (continuous video feed of Thomas in cell).
[12] Rec. Doc. 27-12 at 23:10-24:7, 25:2-17, 34:20-35:10, 38:1-6 (Ex. N).

sheet completed for Thomas dated July 14, 2017, indicating that Thomas had a medical history of diabetes mellitus, seizure disorder, brain aneurysm, stroke, underlying cardiac disease, and substance abuse.[13] Champagne did not review this sheet from 2017 when Thomas was brought into the jail.[14]

The recorded videos show Thomas in the padded cell, progressing from pacing, sitting, and ultimately lying down and exhibiting jerking movements.[15] During her shift, which ended between 5:30 and 6:00 p.m., Champagne observed him only walking and talking to himself, acting simply like a person under the influence, such that there was no reason for her to call EMS based on her observations.[16]

Named defendants Captain Janice Johnson and Corrections Officer Lisa Erwin worked a night shift on March 23, 2023, and thus neither had been present during Thomas's arrest and subsequent booking at the jail.[17] Johnson was assigned to the patrol division night shift as a supervisor and was not formally assigned to the jail.[18] She was working in her office, located in the same building as the jail,[19] when Bogalusa Corrections Officer Zachary Lemaire summoned her to the padded cell in which Thomas was being held.[20] At approximately 6:32 p.m., it had become apparent to Lemaire that Thomas might need medical attention.[21] Thomas was face down and

---

[13] *Id.* at 34:20-35:10, 38:1-6; Rec. Doc. 29-2 § III (Dr. Edler Medical Aff.).
[14] Rec. Doc. 27-12 at 35:8-10 (Ex. N).
[15] Exs. O, P, Q, and R.
[16] Rec. Doc. 27-12 at 26:18-27:16, 30:3-31:10 (Ex. N).
[17] Rec. Doc. 27-7 at 14:15-21 (Johnson Dep. Tr., Ex. G); Rec. Doc. 27-9 at 17:19-18:7, 20:6-10 (Ex. I).
[18] Rec. Doc. 27-7 at 11:12-25, 13:3-17 (Ex. G); Rec. Doc. 27-8 (Bogalusa Police Department Incident Report by Johnson, Ex. H).
[19] Rec. Doc. 27-7 at 13:14-17 (Ex. G).
[20] Rec. Doc. 27-8 (Ex. H).
[21] Rec. Doc. 27-7 at 14:5-6 (Ex. G); Rec. Doc. 27-8 (Ex. H).

acting "weird, like tweaking out."[22] Lemaire also was assigned to the evening shift and had not been present when Thomas was arrested and placed in the padded cell.[23] Upon observing Thomas, Johnson promptly directed that EMS be called to evaluate Thomas.[24] Because Thomas was lying face down, Lemaire turned him over, at which time they observed dried blood around his mouth.[25] Johnson and Lemaire held his head up and opened his mouth to ensure his airway was clear.[26] Thomas was conscious,[27] but his eyes were closed, he was slightly jerking, he was muttering and clenching his jaws, and his speech was incoherent.[28] Thomas's hands were also clenched.[29]

EMS personnel from Northshore Ambulance Service arrived at approximately 6:37 p.m.[30] Erwin arrived while EMS was on the scene.[31] Johnson then returned to her duties supervising the patrol night shift, and, before doing so, briefed Erwin, who was the supervisor over the jail at that time. Johnson passed along to Erwin an inquiry from EMS—"they're wondering whether or not you want to transport him."[32]

EMS asked Thomas questions (to which he provided unintelligible responses), felt his skin, and observed Thomas's extremities shaking but ultimately advised that

---

[22] Rec. Doc. 27-13 at 17:20-24 (Lemaire Dep. Tr., Ex. S).
[23] *Id.* at 14:20-15:11; Rec. Doc. 27-14 (Bogalusa Police Department Incident Report by Lemaire, Ex. T).
[24] Rec. Doc. 27-7 at 52:10-19 (Ex. G).
[25] *Id.* at 48:11-17, 49:19-22, 58:12-19, 59:9-19; Rec. Doc. 27-13 at 26:2-11 (Ex. S).
[26] Rec. Doc. 27-7 at 58:12-19, 59:9-19 (Ex. G); Rec. Doc. 27-8 (Ex. H).
[27] Rec. Doc. 27-13 at 25:18 (Ex. S).
[28] Rec. Doc. 27-8 (Ex. H); Rec. Doc. 27-7 at 51:24-52:9, 55:20-56:7, 60:8-9 (Ex. G); *see also* Rec. Doc. 27-13 at 25:19-26:1 (Ex. S) (Lemaire testified that Thomas was "mumbling" and the only coherent word he recalls was "Bogalusa").
[29] Rec. Doc. 27-8 (Ex. H).
[30] Rec. Doc. 27-19 (Bogalusa Police Department Incident Report by Jeanfreau, Ex. Z).
[31] Rec. Doc. 27-9 at 20:19-21:2 (Ex. I).
[32] Rec. Doc. 27-7 at 70:15-23, 71:4-10, 79:11-80:2 (Ex. G); Rec. Doc. 27-9 at 43:10-16 (Ex. I).

Thomas was likely not having a seizure as initially believed.[33] Incident reports prepared by Johnson and Lemaire state that EMS advised that Thomas's condition was not likely life threatening.[34] However, Collin Magee, the EMS paramedic who assessed Thomas, testified that in response to a jail officer asking him if there was a life threat, Magee responded that he "cannot assess for life threats" and "can't medically clear this patient."[35] Magee further testified that the jail "decided just to keep him at the jail to keep an eye on him."[36] Despite this decision, Magee testified that if it had been his decision "I would have [taken] him to the hospital."[37] This view was also expressed by his EMT partner, who testified that he wanted to take Thomas to the hospital but did not have the authority to make any recommendation to the officers.[38]

Erwin called Warden Charles McDaniel to ask him if the corrections officers should authorize EMS to transport Thomas to the hospital.[39] The warden had completed his shift earlier and the day and was at his home. Erwin could not recall whether a corrections officer or EMS personnel told her that Thomas's condition was not life threatening.[40] The warden submitted a declaration stating that Erwin told him that *EMS personnel* had determined that Thomas was not suffering a life-

33 Rec. Doc. 27-15 at 18:8-8-19 (Magee Dep. Tr., Ex. U); Rec. Doc. 27-8 (Ex. H); Rec. Doc. 27-16 at 20:6-21:16 (Creppel Dep. Tr., Ex. V). There is disputed testimony as to whether EMS took Thomas's pulse or vitals.
34 Rec. Doc. 27-8 (Ex. H); Rec. Doc. 27-14 (Ex. T); *see also* Rec. Doc. 27-13 at 35:17-25 (Ex. S) (Lemaire recalled EMS making this statement).
35 Rec. Doc. 27-15 at 20:7-10 (Ex. U); *see also id.* at 21:9-10 ("We are not allowed to medically clear any patient.").
36 *Id.* at 20:11-12.
37 *Id.* at 21:15-16; *see also id.* at 25:17-25 ("[H]e should be transported to the hospital.").
38 Rec. Doc. 27-16 at 13:14-18, 23:15-19 (Ex. V).
39 Rec. Doc. 27-9 at 24:23-25:20 (Ex. I).
40 *Id.* at 26:16-24 (Ex. I).

threatening medical emergency or condition that required medical care or transport to the hospital for treatment.[41] The warden made the determination that Thomas should stay in the padded cell for further observation rather than be transferred to the hospital based on this information.[42] Erwin signed Northshore EMS's Refusal of Treatment/Transport form, which, in the first-person voice, states that Thomas voluntarily refused transportation by Northshore EMS.[43]

A few minutes after EMS departed, a corrections officer checking on Thomas found that he did not appear to be breathing.[44] Erwin then could not locate a pulse on Thomas and directed Lemaire to notify dispatch that there was an emergency and to have EMS return to the jail.[45] Officers began performing CPR until EMS arrived and loaded Thomas into the truck to go to the hospital.[46] Magee ventilated Thomas in the EMS truck, continued CPR, and determined that Thomas was hypoglycemic.[47] Thomas was pronounced dead at the hospital.[48]

A postmortem examination determined Thomas's cause of death was methamphetamine toxicity and the manner of death was accidental.[49] Plaintiff's expert, Dr. Rayme Michelle Edler, opines that Thomas's collapse and death were due to untreated hypoglycemia and metabolic encephalopathy, citing his blood glucose was less than 10 mg/dL upon his arrival at the hospital, and that earlier medical

---

41 Rec. Doc. 27-10 ¶¶ 7-8 (Ex. J.).
42 Rec. Doc. 27-10 ¶¶ 7-8 (Ex. J.); Rec. Doc. 27-9 at 25:3-12 (Ex. I).
43 *Id.* at 36:3-37:3, 38:15-39:17.
44 *Id.* at 31:18-24.
45 *Id.* at 32:2-12.
46 *Id.* at 33:8-14; Rec. Doc. 27-16 at 15:5-24 (Ex. V).
47 Rec. Doc. 27-15 at 31:17-32:21 (Ex. U).
48 *Id.* at 31:17-32:21.
49 Rec. Doc. 27-11 (Postmortem Examination, Ex. K).

intervention more likely than not would have prevented his death.[50]

Bogalusa jail personnel "have basic medical training including CPR and are instructed to call EMS if any inmate appears to need to be medically evaluated."[51] Champagne and Erwin confirmed that they and the other jail officials received first aid training,[52] and that their training and experience is that a jail official should call EMS if he or she determines a detainee needs medical help.[53] The warden then makes the decision whether or not to take the detainee to the hospital.[54] The travel time from the jail to the hospital is approximately four or five minutes.[55]

Defendants now seek summary judgment on Plaintiffs' claims under Federal Rule of Civil Procedure 56.

## II. Summary Judgment Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[56] "An issue is material if its resolution could affect the outcome of the action."[57] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[58] All reasonable inferences are drawn in

---

[50] Rec. Doc. 29-2 §§ IX-XII.
[51] Rec. Doc. 27-10 ¶ 14 (Ex. J).
[52] Rec. Doc. 27-9 at 15:2-3 (Ex. I); Rec. Doc. 27-12 at 12:11-17 (Ex. N)
[53] Rec. Doc. 27-9 at 15:3-6 (Ex. I); Rec. Doc. 27-12 at 33:25-34:10 (Ex. N).
[54] Rec. Doc. 27-12 at 36:15-19 (Ex. N).
[55] Rec. Doc. 27-7 at 64:16-19 (Ex. G).
[56] Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[57] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[58] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

favor of the nonmoving party.[59] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[60]

If the dispositive issue is one for which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[61] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the nonmoving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[62]

On the other hand, if the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[63] When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be

---

[59] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[60] *Smith v. AmedisysInc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[61] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257,1264-65 (5th Cir. 1991) (citation modified).
[62] *Celotex*, 477 U.S. at 322-24.
[63] *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987); *Fano v. O'Neill*, 806 F.2d 1262, 1266 (5th Cir. 1987); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2727.1 (2016) (discussing *Celotex* summary-judgment burden of proof standard).

useless, and the moving party is entitled to summary judgment as a matter of law.[64] When, however, the movant is proceeding under the second option and is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[65] Under either scenario, the burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[66] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[67] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[68]

Still, "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the claim."[69] "Rule 56 does not impose upon the district court a duty to sift

---

[64] *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).
[65] *Celotex*, 477 U.S. at 332-33.
[66] *Id.*
[67] *Id.* at 332 n.3.
[68] *Id.*; *see also First Nat'l Bank of Ariz.*, 391 U.S. at 289.
[69] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

through the record in search of evidence to support a party's opposition to summary judgment."[70]

## III. Analysis

### A. The claims against defendants Bullen, Johnson and Erwin, sued in their individual capacities.

Individual defendants Bullen, Johnson, and Erwin assert they are protected from suit by the doctrine of qualified immunity as public officials.[71] Government officials performing discretionary functions generally are shielded from civil liability for damages so long as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[72] The qualified immunity analysis thus has two components: "(1) whether a plaintiff alleges or shows the violation of a federal constitutional or statutory right; and (2) whether the right in question was clearly established at the time of the alleged violation."[73] Once a defendant raises qualified immunity as a defense, "the plaintiff bears a heightened burden to negate the defense."[74]

When demonstrating that a right is "clearly established," the plaintiff must show that the defendant officials had "fair warning" under past precedent.[75] In doing so, "she must point to 'authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitely unlawful."[76] Here, Plaintiff

---

[70] *Id.* (citation modified).
[71] Rec. Doc. 4 at 6; Rec. Doc. 27 at 15.
[72] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
[73] *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021).
[74] *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (citation modified).
[75] *Hicks v. LeBlanc*, 81 F.4th 497, 504 (5th Cir. 2023) (citation modified).
[76] *Bailey v. Ramos*, 125 F.4th 667, 674 (5th Cir. 2025) (citation modified).

asserts that Thomas had a constitutional right under the Fourth and Fourteenth Amendments to be protected against the use of excessive force without cause or justification and under the Fourteenth Amendment's Due Process Clause not to have his medical needs met with deliberate indifference by Bogalusa jail officials.[77] The Court thus analyzes whether Plaintiff's allegations meet her burden of showing a violation of these rights and that the rights were clearly established at the time of the alleged violation.

#### 1. Counts I and II: Unreasonable seizure and use of excessive force and civil rights conspiracy against Johnson and Erwin

"Plaintiff does not oppose summary judgment on Count I (unreasonable search and excessive force) and Count II (conspiracy)" as against Johnson and Erwin in their individual capacity, to the extent the claims are premised on physical force during arrest and initial detention.[78] Plaintiff acknowledges that Johnson and Erwin were not present during Thomas's arrest, that both were assigned to the night shift, and that Johnson was not formally assigned to the jail.[79] Outside of two vague and conclusory assertions that these and other defendants "used excessive force in the seizure" of Thomas[80] and intended "to physically harm [Thomas],"[81] the complaint

---

[77] *See generally* Rec. Doc. 1; *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001).
[78] Rec. Doc. 29 at 20.
[79] Rec. Doc. 29-1 ¶¶ 1-3; Rec. Doc. 27-2 ¶¶ 1-3. Despite Plaintiff's assertion that Johnson gave no testimony as to when she reported to work on March 23, 2023, Johnson testified, unrebutted by any evidence cited by Plaintiff, that she was working the night shift, Rec. Doc. 27-7 at 14:19-21 (Ex. G). Similarly, while the precise time of Erwin's arrival at work is disputed within an approximate hour timeframe, there is unrebutted testimony that she arrived in the evening for her shift. *See* Rec. Doc. 27-9 at 10:18-23 (Ex. I); Rec. Doc. 27-7 at 81:5-7 (Ex. G).
[80] Rec. Doc. 1 ¶ 22.
[81] *Id.* ¶ 27.

makes no allegations that Johnson or Erwin used force against Thomas. Nor is there any hint of excessive force by Johnson or Erwin or anyone else on any of the continuous surveillance videos from the jail. Nor is there any record evidence that Johnson or Erwin was present for or conspired with respect to others' use of excessive force against Thomas. Bystander liability does not "attach where an officer is not present at the scene of the constitutional violation."[82] Moreover, a conspiracy must allege with specificity an agreement among the participants.[83] Given the absence of allegations and record evidence that could plausibly underlie any violation by Johnson or Erwin of Thomas's right to be free from excessive force or a conspiracy with others to that end, these claims are dismissed as to Johnson and Erwin.[84]

#### 2. Count III: Failure to intervene in violation of the Fourth and Fourteenth Amendments

The entirety of Plaintiff's allegations in Count III is that, "[u]pon information and belief, one or more of the Defendants observed some other or one of the Defendant(s) using objectively unreasonable and excessive force, in violation of Decedent's constitutional rights and failed to intervene," and such failure caused Thomas's injuries, and violated the due process rights of Thomas and his mother.[85] Because Plaintiff fails to allege that Bullen, Johnson, or Erwin even observed any use

---

[82] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).
[83] *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019) (per curiam) ("Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983.") *See also McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir. 1989) (citation modified) ("It is now well settled in this Circuit that mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy.").
[84] Counts I and II are alleged against Bullen only in his official capacity. Those claims are addressed *infra*.
[85] Rec. Doc. 1 ¶¶ 32, 33.

of objectively unreasonable and excessive force in violation of Thomas's constitutional rights, Count III fails as to these defendants, to the extent it was alleged against them at all.

### 3. Count V: Denial of adequate medical care in violation of the Fourteenth Amendment

Plaintiff alleges that Johnson and Erwin were aware of Thomas's serious physical distress through their interactions with him and, as evidenced by their response and/or nonresponse, intended for harm to occur to him in violation of his Fourteenth Amendment right to due process.[86] The Fourteenth Amendment guarantees pretrial detainees the "right not to have their serious medical needs met with deliberate indifference on the part of the confining officials."[87] Thus, a state official violates a pretrial detainee's due process right to adequate medical care if the official "acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries."[88] A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."[89]

A deliberate-indifference claim requires that the officer (1) was objectively aware of facts from which the officer could infer that a substantial risk of harm exists, and (2) had actual, subjective knowledge of the risk of harm.[90] "Mere negligence or a failure to act reasonably is not enough."[91] The plaintiff "must show that the officials

---

[86] Rec. Doc. 1 ¶¶ 41-46.
[87] *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (citation modified).
[88] *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003).
[89] *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022) (citation modified).
[90] *Dyer*, 964 F.3d at 380.
[91] *Mace*, 333 F.3d at 625-26.

refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[92] The inquiry thus focuses on what each individual officer knew, "not what they should have perceived but did not."[93] "[A]n incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."[94] "Deliberate indifference is an extremely high standard to meet."[95]

The Court addresses Johnson first. On March 23, 2023, Johnson was working the night shift on patrol for the Bogalusa Police Department.[96] She was working in her office when a corrections officer summoned her to the padded cell in which Thomas was being held because it had become apparent that Thomas might need medical attention.[97] Upon observing Thomas, she directed that EMS be called to evaluate Thomas medically.[98] She briefed and passed along EMS's transport inquiry to the jail supervisor coming onto shift (Erwin) before returning to her own supervisory position.[99] There is no evidence that Johnson previously was aware of Thomas's presence in the jail. Once a corrections officer notified Johnson that Thomas might be in distress, Johnson immediately went to observe him and then promptly ordered a call to EMS. Video surveillance shows that she stayed with Thomas while waiting for EMS to arrive, holding his head up to ensure he could breathe. These

---

[92] *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (citation modified).
[93] *Williams v. City of Yazoo*, 41 F.4th 416, 423 (5th Cir. 2022) (citation modified); *Dyer*, 964 F.3d at 380 (citation modified); *see also Thorpe v. Weaver*, 180 F.4th 834, 838-39 (5th Cir. 2026) (same).
[94] *Domino*, 239 F.3d at 756.
[95] *Id.*
[96] Rec. Doc. 27-2 ¶¶ 3-4; Rec. Doc. 29-1 ¶ 3.
[97] Rec. Doc. 27-2 ¶¶ 19-20; Rec. Doc. 29-1 ¶¶ 19-20.
[98] Rec. Doc. 27-2 ¶ 21; Rec. Doc. 29-1 ¶ 21.
[99] Rec. Doc. 27-7 at 70:15-23, 71:4-10, 79:15-80:2 (Ex. G); Rec. Doc. 27-9 at 43:10-16 (Ex. I).

undisputed facts reveal that, rather than acting with deliberate indifference or intent to cause harm to Thomas, Johnson affirmatively sought medical attention for him. Once EMS arrived, she briefed Erwin on the situation and the transport inquiry. That Johnson, who is not a medical professional, did not disregard her patrol duties to stay at the scene while a jail supervisor and EMS were present does not meet the standard for deliberate indifference. Accordingly, Count V is dismissed as to Johnson.

The Court next turns to Erwin. On March 23, 2023, Erwin worked an evening shift and thus, like Johnson, was not present during Thomas's arrest or booking. Upon Erwin's arrival at Thomas's cell, Johnson briefed Erwin as to why EMS was called and their transport inquiry. Erwin testified that either an "EMS guy" or a "corrections officer"—she was not sure which of the two—told her that Thomas was *not* suffering a life-threatening event.[100] There is a significant factual dispute over not only what Erwin told the warden, but, as relevant to that dispute, also whether EMS made such a comment at all. Both EMS personnel gave deposition testimony that they lacked authority to make any recommendation on transport, did not tell the officers that Thomas's condition was likely not life threatening, and would have transported him if it had been their decision.[101] Incident reports and other deposition testimony, meanwhile, state that EMS personnel did tell officers that Thomas's condition was likely not life threatening.[102] Warden McDaniel, who was not present and was relying on Erwin's communications, directed that Thomas should not be

[100] Rec. Doc. 27-9 at 26:16-24 (Ex. I).
[101] Rec. Doc. 27-15 at 20:7-12, 21:15-16, 25:17-25 (Ex. U); Rec. Doc. 27-16 at 13:14-18, 23:15-19 (Ex. V).
[102] Rec. Doc. 27-8 (Ex. H); Rec. Doc. 27-14 (Ex. T); *see also* Rec. Doc. 27-13 at 35:17-25 (Ex. S) (Lemaire recalled EMS making this statement).

transported to the hospital based on Erwin's assertion that EMS did not think Thomas was suffering a life-threatening medical condition, and the record does not reflect that she provided additional information about Thomas's condition to the warden.

Viewing these facts in the light most favorable to Plaintiff, a jury could find that Erwin was objectively aware of a substantial risk of harm to Thomas and had actual subjective knowledge of the risk of harm. An official's "knowledge of a substantial risk of harm may be inferred if the risk was obvious."[103] A jury could find that Erwin, knowing that Thomas would be denied medical attention, "misstated the severity" of Thomas's condition to those who would have provided help (i.e., the warden) when Thomas obviously required medical attention.[104]

Thomas's right to adequate medical care while in state custody was clearly established at the time. A right is "clearly established" if it is "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right."[105] Prior decisions need only give "reasonable warning" that the conduct violated constitutional rights, even if "notable factual distinctions" exist in the precedents relied upon.[106]

Precedent firmly established at the time of the conduct at issue that a detainee could demonstrate a constitutional violation by showing an official "refused to treat

---

[103] *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994)).
[104] *See Dyer*, 964 F.3d at 385.
[105] *Easter*, 467 F.3d at 465 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (modification in original).
[106] *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (citation modified).

him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[107] Several cases are sufficiently similar to provide "reasonable warning" to Erwin.

In *Dyer*, the Fifth Circuit affirmed the district court's finding that there was a genuine dispute concerning whether the officers were deliberately indifferent to the needs of a detainee in custody where they knew the detainee had violently struck his head repeatedly in the patrol car and could have sustained head trauma, and neither independently sought medical care for the detainee nor alerted other officials on duty as to the possibility that the detainee had seriously injured himself.[108] The court held that a reasonable jury could find that the injuries, from which the detainee would die within 24 hours "were so severe, and their cause so plainly evident" that the officers acted with deliberate indifference by failing to seek medical attention, failing to inform jail personnel of his injuries, and informing jail personnel only that the detainee had been "medically cleared" before arriving at the jail.[109] These facts are plainly on point here. Viewing the facts in favor of Plaintiff, Erwin was aware of Thomas's condition, misstated his need for medical attention to the warden, and otherwise failed to seek medical care.

*Thompson v. Upshur County, Texas*[110] is also on point. It established that

[107] *Domino*, 239 F.3d at 756 (citation modified); *see also Easter*, 467 F.3d at 465 (quoting *Domino* for this proposition).
[108] *Dyer*, 964 F.3d at 382.
[109] *Id.* at 381-82.
[110] 245 F.3d at 447.

officials act deliberately indifferent, and violate a detainee's constitutional rights, when they ignore the dangers of substance abuse withdrawal and wait for a "manifest emergency" to summon medical help.[111] In *Thompson*, an official knew that a detainee had begun colliding with objects in his cell and striking his head as he was suffering from delirium tremens while withdrawing from alcohol.[112] The official provided some care to Thompson: placing him in a straitjacket (but without a helmet), providing extra mattresses in his cell, dressing his head wound, and allegedly, seeking advice from a hospital.[113] When her shift ended, however, she instructed her colleagues not to summon medical help without contacting her and only if Thompson was dying. Seven hours later, Thompson died from a seizure.[114] The court found a jury question as to whether the official's behavior was objectively unreasonable given clearly established law forbids a significantly exacerbating delay or a denial of medical care to a detainee suffering [substance withdrawal]."[115] The court further concluded that any reasonable jailer "would have recognized the constitutional obligation to summon medical assistance well before [the detainee] died" and also would not have instructed colleagues not to obtain help unless the detainee "was on the verge of death."[116]

Here, just as in *Dyer*, a reasonable jury could find that the injuries, from which Thomas would die moments later "were so severe, and their cause so plainly evident"

---

[111] *Thompson*, 245 F.3d at 454.
[112] *Id.* at 458.
[113] *Id.* at 453-54, 463.
[114] *Id.* at 454.
[115] *Id.* at 463 (citation modified).
[116] *Id.* at 464.

that Erwin acted with deliberate indifference by failing to seek medical attention, failing to inform the warden of Thomas's true condition, and instead misstating that EMS had determined his condition not to be life-threatening. Under the law at the time of these events, no officer could believe they could lawfully turn away medical care or could "misstate[] the severity" of a detainee's condition "to those who could have sought help" when an objective observer would understand the need for immediate medical attention.[117] Existing precedent placed the constitutional question "beyond debate."[118]

Genuine issues of material fact preclude summary judgment for Erwin on Count V.

### B. The claims asserted against Chief Bullen, sued in his official capacity, and the City of Bogalusa.

Construing the allegations in the complaint broadly in Plaintiff's favor, Plaintiff alleges Counts I, II, III, and VI against Bullen, Chief of the Bogalusa Police Department, in his official capacity.[119] Such official capacity are equivalent to suits against the municipal entity, here, Bogalusa.[120] Again construing the allegations broadly, Plaintiff alleges Counts I, II, III, IV, and VII against the City of Bogalusa.

Under *Monell v. Department of Social Services*, a municipality or other local governing body is liable under 42 U.S.C. § 1983 when an action that is alleged to be unconstitutional implements an official policy or custom adopted or promulgated by

---

[117] *See Dyer*, 964 F.3d at 385.
[118] *Id.* at 383 (quoting *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc)).
[119] Rec. Doc. 1.
[120] *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

the locality's officers.[121] Municipalities cannot be held liable under § 1983 on a *respondeat superior* theory; however, they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."[122] The unconstitutional conduct "must be directly attributable to the municipality through some sort of official action or imprimatur."[123] "[I]solated unconstitutional actions by municipal employees will almost never trigger liability."[124]

To survive summary judgment, a plaintiff must demonstrate a dispute of fact as to: (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.[125] For each § 1983 count against Bullen, the plaintiff must establish that Bullen is the final policymaker for the city and identify the city policy or custom that alleged caused the deprivation of Thomas's constitutional rights.[126]

**1. Count I: Unreasonable seizure and use of excessive and deadly force against Bullen and the City**

Plaintiff alleges in Count I that Bullen and the City are liable under *Monell* and vicariously under Louisiana state law for the conduct of Johnson, Erwin, and John Doe Defendants in their use of excessive force in the seizure of Thomas,

---

[121] 436 U.S. 658, 690 (1978).
[122] *Burge v. Parish of St. Tammany*, 187 F. 3d 452, 471 (5th Cir. 1999) (quoting *Monell*, 436 U.S. at 691).
[123] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).
[124] *Id.* at 578.
[125] *Webb of Town of St. Joseph*, 925 F.3d 209, 214 (5th Cir. 2025).
[126] *Murray v. Town of Mansura*, 76 F. App'x 547, 549 (5th Cir. 2003); *Treece v. Louisiana*, 74 F. App'x 315, 316 (5th Cir. 2003)); *see also Hernandez v. Theriot*, 38 F. Supp. 3d 745, 746 (M.D. La. 2014) ("A suit against a municipal Police Chief in his/her official capacity is a suit against the municipality.") (citing *Hafer v. Melo*, 502 U.S. 21 (1991).

resulting in his death, and in conspiring to restrict facts about the nature of their conduct.[127] As discussed in Section III.A.1, Johnson and Erwin did not participate in Thomas's arrest and thus could not have used excessive force against Thomas during his arrest. Moreover, there is no allegation of any other member of the Bogalusa Police Department engaging in any excessive force against Thomas. Without a constitutional violation, there can be no *Monell* liability. Accordingly, Count I against the City and Bullen for is dismissed.

#### 2. Count II: Civil rights conspiracy against Bullen and the City

As to Count II, a civil rights conspiracy claim "is not actionable without an actual violation of section 1983."[128] And where the claim is actionable, it requires "an agreement among the alleged co-conspirators to deprive [the plaintiff] of [her] constitutional rights."[129] The operative facts of the alleged agreement must be pled with specificity. Mere conclusory allegations of conspiracy will not suffice.[130]

Plaintiff's complaint alleges a civil rights conspiracy only "upon information and belief" and in conclusory fashion. Even those allegations fail to allege an actual agreement of the alleged co-conspirators. Instead, plaintiff alleges merely a "common motive" and "the blessing of the City and Chief Bullen" in support of "conspir[ing] to

---

[127] Rec. Doc. 1 ¶¶ 19-24.
[128] *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (citation modified).
[129] *Montgomery*, 759 F. App'x at 314 (per curiam); *see also Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994).
[130] *Montgomery*, 759 F. App'x at 314 (per curiam) ("Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983."); *see also McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir. 1989) (citation modified) ("It is now well settled in this Circuit that 'mere conclusory allegations of conspiracy cannot, absent reference to material facts,' state a substantial claim of federal conspiracy.").

hide the truth" of Thomas's condition and "to refuse to comply with subpoenas" to cover up their actions. Without any alleged agreement among the alleged co-conspirators, the Plaintiff's conspiracy claim in Count II is dismissed against Bullen and the City.

### 3. Count III: Failure to intervene in violation of the Fourth and Fourteenth Amendments against Bullen and the City

For the avoidance of doubt, and for the reasons discussed above with respect to the individual defendants, this claim is dismissed to the extent it is alleged against Bullen or the City.

### 4. Count IV: Denial of Adequate Medical Care—Conditions of Confinement against the City of Bogalusa

To establish an official policy for purposes of municipal liability under *Monell*, a plaintiff can point to "written policy statements, ordinances, or regulations," or "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."[131] However, in rare cases, just a single decision may constitute a municipal policy when the official or entity with "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."[132]

Plaintiff alleges that the City of Bogalusa is responsible for having "explicit policies and/or *de facto* policies or restrictions regarding conditions at the City of Bogalusa Jail."[133] These policies included not properly treating detainees such as

---

[131] *Alvarez v. City of Brownsville*, 904 F.3d 382, 389-90 (5th Cir. 2018) (en banc) (citation modified).
[132] *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (citation modified).
[133] Rec. Doc. 1 ¶ 37.

Thomas for their medical needs or evaluating and monitoring their injuries and/or illnesses.[134]

Here, the Court found that a jury may conclude that Erwin violated Thomas's constitutional rights under the Fourteenth Amendment. To survive Defendants' motion for summary judgment on Count IV, then, Plaintiff must demonstrate the existence of, or a dispute of material fact over the existence of an official policy promulgated by the City that was the moving force behind the violation. Plaintiff describes the custom as: "no medical facility; detection of medical needs by inmate *self-reporting*; padded-cell warehousing until detainees 'come down'; and no medical assessment because the City 'cannot afford' it."[135] Plaintiff further describes the custom as including that the jail's screening sheet is completed only for detainees lucid enough to give clear information, two-officer shifts, no assigned observer, no written monitoring rule, untrained staff, and "three or four prior deaths," in the past 22 years, including two suicides by hanging.[136] Plaintiff argues that the lack of screening protocol meant that Thomas did not receive medical evaluation until he was found bleeding on the floor.[137]

None of these are sufficient to survive Defendants' motion for summary judgment. The undisputed record evidence shows that the staff received medical

---

[134] Plaintiff's Count IV alleges a violation of 42 U.S.C. § 1983 as a conditions-of-confinement claim. Under Fifth Circuit precedent, there is "no meaningful difference" between the elements of a conditions-of-confinement claim and a *Monell* claim. *Estate of Bonilla ex rel. Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 308 (5th Cir. 2020). The standard of causation is the same for both theories of liability: "the policy or custom must have been the moving force behind the violation." *Id.* (citation modified).

[135] Rec. Doc. 29 at 18; *see also* Rec. Doc. 1 ¶¶ 37-39 (similar complaint allegations).

[136] Rec. Doc. 29 at 18; *see* Rec. Doc. 27-9 at 8:1-3, 11:4-12:5.

[137] Rec. Doc. 29 at 19.

training, and any lack of medical training was not the moving force behind the constitutional violation. To the extent the other arguments involve an official policy or custom, they were not the moving force either. Jail officials provided undisputed testimony that they were monitoring Thomas on the video surveillance almost constantly, such that the lack of an assigned observer or written monitoring rule was not the moving force. Officials were aware that Thomas was intoxicated—that's why he was in the padded cell—such that recording that information in a form would not have changed the course of events. Plaintiff acknowledges that Thomas's intoxication from methamphetamines is known to mask or mimic symptoms that he might have been suffering due to hypoglycemia.[138] Regardless of the cause, once a corrections officer observed Thomas in clear distress, he sought Johnson's assistance, and she promptly directed a call to EMS. Nor was the two-person shift a moving force behind the violation. The record shows that correctional officers could and did call for assistance from the police department or through the dispatch system when needed. The alleged constitutional violation traces to a lone employee (Erwin) who is not alleged to have followed any custom or policy when she allegedly ignored what a jury may find to be Thomas's obvious need for transport to the hospital and provided inaccurate information with the warden that she knew would result in Thomas not receiving medical care. Plaintiff identifies no custom or practice by Bogalusa of sharing or withholding this type of information or providing inaccurate information to the warden or other decisionmakers.

---

[138] Rec. Doc. 29-2 § IX.

Finally, Plaintiff does not allege that Bogalusa ever previously had a detainee suffer an overdose or hypoglycemic death due to officers' failure to obtain medical care. And Plaintiff certainly doesn't allege that Bogalusa ever had an incident in which anyone died or was gravely injured because an official provided inadequate, misleading, or untrue information to those responsible for making medical care decisions. Plaintiff provided no information about the "three or four" prior deaths in the last two decades other than that two were suicides by hanging. For none of these is there any indication that the deaths involved a similar fact pattern.

Accordingly, Count IV is dismissed.

#### 5. Count VI: Monell Municipal Violations under 42 U.S.C. § 1983 against Bullen

Plaintiff alleges a *Monell* municipal violation under § 1983 against Bullen, arguing that Bullen demonstrated deliberate indifference to the violation of the constitutional rights of Thomas and other residents of the City of Bogalusa. Plaintiff alleges this deliberate indifference was manifested through the implementation of and failure to change policies, procedures, and customs regarding similar incidents involving Bogalusa residents, including the right to be free from unlawful seizure, the right to be free from excessive force, and the right to medical care when detained in jail.

As an initial matter, Plaintiff's episodic acts-or-omissions theory of liability is predicated on the individual defendants' alleged subjective indifference to Thomas's medical needs resulting from a municipal policy or custom. For the reasons discussed above, this theory of liability is foreclosed.

To establish liability under Plaintiff's failure-to-train theory, Plaintiff must prove: "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights."[139] Again, for the reasons discussed above, this theory of liability is foreclosed.

Finally, Plaintiffs also allege a ratification theory of *Monell* liability against Bullen based on his alleged refusal to release requested information about Thomas's arrest, detention, and death.[140] A policymaker's ratification may form the basis of municipal liability if the authorized policymaker approves a subordinate's decision and the basis for it.[141] Ratification requires the actual approval of a policymaker, not their mere acquiescence.[142] The Fifth Circuit has "narrowed the theory of ratification to extreme factual situations."[143] Bullen's alleged refusal to release information is too far removed from Erwin's action underlying the constitutional violation to establish that he approved of her action *and the basis* for it. Noncompliance with records requests, whether made by discovery requests or public records requests under state law, is neither a constitutional violation that is enforceable under Section 1983 nor the sort of extreme situation that provides ratification liability.[144]

---

[139] *Hutcheson v. Dallas Cty.*, 994 F.3d 477, 482 (5th Cir. 2021).
[140] Rec. Doc. 1 ¶ 53.
[141] *Sligh v. City of Conroe*, 87 F.4th 290, 303 (5th Cir. 2023).
[142] *Benfer v. City of Bay Town*, 120 F.4th 1272, 1287 (5th Cir. 2024).
[143] *Stacy v. Lewisville Indep. Sch. Dist.*, No. 4:26-cv-541, 2026 WL 2097231, at *2 (E.D. Tex. July 20, 2026) (Barker, J.) (citing *Snyder v. Trepagnier*, 142 F.3d 791 (5th Cir. 1998) (.
[144] *See Moreland v. Kolb*, No. 24-cv-1424, 2026 WL 1981429, at *10-12 (W.D. La. May 15, 2026), *report and recommendation adopted by* 2026 WL 1980863 (W.D. La. July 8, 2026) (Van Hook, J.).

### 6. Count VII: State Law Violations and Vicarious Liability of the City of Bogalusa under State Law

Plaintiff alleges that the City is vicariously liable for state law torts by Bullen, Johnson, Erwin, and John Doe Officers while in the course and scope of their duties during Thomas's death. Plaintiffs allege that these individuals breached the duty of care that custodians owe pretrial detainees in their custody by failing to provide safe incarceration and medical attention for Thomas, failing to allow him to be treated, deliberate indifference, and violating official policies.[145] Defendants claim these individual defendants have discretionary-function immunity under La. Rev. Stat. Ann. § 9:2798.1.[146] Section 9:2798.1 grants immunity from liability to public officers or employees for the performance or failure to perform discretionary acts within the course and scope of their employment. This statutory provision provides an exception to this immunity where the acts or omissions are not reasonably related to public policy considerations.

Here, even without the protections of § 9:2798.1, the state-law claims for vicarious liability as to Johnson and Bullen fail because Plaintiff has not put forth evidence to support any breach of duty by Johnson or Bullen for the reasons discussed above.

The state-law claim for vicarious liability as to Erwin, however, survives. There is a genuine issue of material fact as to whether Erwin violated Thomas's rights under the Fourteenth Amendment and thus breached her duty to him. The only

---

[145] Rec. Doc. 1 ¶ 55.
[146] Rec. Doc. 4 at 8.

public-policy considerations offered by Defendants for Erwin's conduct are that the City's budget is "extremely limited" and it "cannot afford to send every new inmate to the hospital to be assessed for unknown health conditions."[147] Whether these considerations are reasonably related to Erwin's actions are a fact question. A reasonable jury could find that these policy considerations were unrelated to Erwin's call to the Warden for a transport decision and possible provision of inaccurate or incomplete information, as her call suggests that resources were available for transport in at least some instances.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment[148] is **GRANTED IN PART.**

**IT IS FURTHER ORDERED** that Counts I, II, III, and V against Defendant Captain Janice Johnson, individually, are **DISMISSED**.

**IT IS FURTHER ORDERED** that Counts I, II, and III against Defendant Officer Lisa Erwin, individually, are **DISMISSED**.

**IT IS FURTHER ORDERED** that Counts I, II, III, and VI against Defendant Chief Kendall Bullen, in his respective individual and official capacity, are **DISMISSED**.

---

[147] *See* Rec. Doc. 27-2 ¶ 50.
[148] Rec. Doc. 27.

**IT IS FURTHER ORDERED** that Counts I, II, III, and IV against Defendant City of Bogalusa are **DISMISSED**.

New Orleans, Louisiana, this 14th day of October, 2026.

Anna St. John

ANNA ST. JOHN
UNITED STATES DISTRICT JUDGE